*ECR*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JULIE L. HEETER,                        :
                                        :
       Individually and as             :
       Administratrix of the Estate    :      CIVIL ACTION
       of Bryan E. Harris,             :      NO. 16-0557
                                        :
                                        :
              Plaintiff,                :
                                        :
       v.                               :
                                        :            **FILED**
HONEYWELL INTERNATIONAL,                :
INC., et al.,                          :            JUL - 1 2016
                                        :
              Defendants.               :      MICHAEL E. KUNZ, Clerk
                                        :      By_____ Dep Clerk

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          July 1, 2016


          This case arises from the tragic murder of Bryan

Harris by Cea Jay Chattin at Harris's apartment on March 26,

2015. But the specific events giving rise to the claims in this

case preceded the murder by fifteen hours and occurred at a

different place, several miles from Harris's apartment.

According to the Amended Complaint, about fifteen hours before

the murder, Chattin broke into the residence of Harris's mother,

Plaintiff Julie Heeter, and stole the gun that he later used to

kill Harris. Plaintiff's residence was equipped with an alarm

system that was manufactured, sold, or installed by Defendants

ADT, LLC and the ADT Corporation (collectively, "ADT"), and

1

✗ c: Legal

Honeywell International, Inc. ("Honeywell"). When Chattin broke into Plaintiff's residence, the alarm system failed to notify either Plaintiff or the police that there was an intrusion. Plaintiff now seeks to hold ADT and Honeywell[1] liable for the death of her son, Bryan Harris.

Defendant ADT has filed a motion for judgment on the pleadings, and Defendant Honeywell has moved to dismiss. The decisive issue as to both motions is whether the failure of the ADT/Honeywell alarm system to notify the Heeters that an intruder, who turned out to be Chattin, had gained unauthorized access to their residence was the proximate cause of Bryan Harris's death.

## I.   FACTUAL BACKGROUND[2]

On or about October 11, 2014, a sales representative for Defendant ADT met with Plaintiff and her husband, Robert Heeter, at their weekend residence in Benton, Pennsylvania,[3] for

---

[1]     For the purposes of this motion, the Court will treat the liability of Honeywell, the manufacturer of part of the alarm system, and ADT, the installer and operator of the alarm system, as co-extensive.

[2]     The facts are construed in the light most favorable to Plaintiff as the nonmoving party.

[3]     Various terms are throughout the Amended Complaint to describe Plaintiff's residence in Benton, Pennsylvania, such as "weekend home," "home," "the house," "residence," and "the property." See, e.g., Am. Compl. ¶¶ 19, 23, 26(a), 32, 34, 37, 40, 53. For clarity, the location will be referred to as

a security consultation and survey. Am. Compl. ¶¶ 15, 17-19.

Plaintiff told the ADT representative that she was principally

concerned with keeping certain individuals, including Chattin,

off of her property. Id. ¶¶ 15, 23. She also stated that she was

"not so much concerned about the property in the house but

want[ed] a system that w[ould] alert [her and her husband] when

someone comes into the house." Id. ¶ 26(a).

        After negotiations,[4] Plaintiff agreed to purchase the

"ADT Pulse" system, which was installed at her residence on

November 8, 2014. Id. ¶ 37. This system included a control panel

allegedly manufactured by Honeywell. Id. ¶¶ 54, 83, 84. The "ADT

Pulse" system also "operates using the Honeywell 'LYNX PLUS'

a/k/a the 'Safewatch® QuickConnect Plus'" system. Id. ¶ 116.

        On March 26, 2015, at approximately 7:00 a.m., when

the Heeters were not at their residence, Chattin entered through

a window. Id. ¶ 53. He disconnected the phone lines for the

alarm system and removed the system's control panel from the

---

Plaintiff's "residence" or "weekend residence" throughout this
decision.

[4]        Plaintiff goes to great lengths in the Amended
Complaint to describe her negotiations with the representative
during this meeting, as well as her later discussions with the
ADT installer. See Am. Compl. ¶¶ 19-38. However, these
negotiations and discussions are immaterial to whether the alarm
system's failure to perform, which is admitted for the purposes
of this motion, proximately caused Harris's death--the ultimate
issue in this case.

wall. Id. ¶ 54. With the alarm system silenced, Chattin went to the location of the Heeters' heirloom firearms and took the .30 caliber rifle involved in this case. Id. ¶ 55. Chattin then proceeded to Harris's apartment, which was located approximately twenty minutes away, where he waited for Harris to return from work. Id. ¶ 57. Plaintiff received no alert from the alarm system that an unnamed person had gained access to the residence and that the phone lines had been disconnected. Id. ¶ 65.

When Harris returned to his apartment from work, he saw Chattin waiting for him, and the two men had a conversation outside of the apartment.[5] Id. ¶ 58. Their conversation occurred at approximately 8:00 p.m.--twelve hours after Chattin had broken into Plaintiff's residence. Id. After their conversation, Harris entered his apartment alone, watched television, and spoke with his employer on the phone at around 10:30 p.m. Id. ¶¶ 59-60. Sometime later that evening, Chattin entered Harris's apartment and shot Harris in the face with the .30 caliber rifle that he had stolen from Plaintiff's residence earlier that morning. Id. ¶ 61. Approximately fifteen hours had elapsed

---

[5]     The following information is not disclosed in the Amended Complaint: the nature of the relationship between Harris and Chattin; the subject matter of Chattin and Harris's conversation outside of Harris's apartment; the basis or means by which Chattin gained access to Harris's apartment; and why the Heeters feared that Chattin would harm Harris. But these factual gaps are ultimately irrelevant to the disposition of the case.

4

between the time that Chattin broke into Plaintiff's residence and the time that Chattin killed Harris with the .30 caliber rifle he had stolen from Plaintiff's residence. Id. ¶ 89.

The next day, before Plaintiff and her husband began their usual Friday trip to their weekend residence, Plaintiff called Harris, but he did not answer. Id. ¶¶ 62, 63. When she was approximately one hour away from their residence, Plaintiff logged into her phone's ADT app, which did not indicate any intrusion had occurred. Id. ¶¶ 64, 65.

When the Heeters arrived at their residence, they discovered that there had been "a burglary." Id. ¶ 68. They immediately called Harris to ensure he was safe, but there was no answer.[6] Id. Plaintiff called the police, id. ¶ 69, and Mr. Heeter called ADT, id. ¶ 70. ADT stated that it did not see any problem with the alarm system. Id. Later that evening, Harris's employer found Harris's body inside Harris's apartment. Id. ¶ 76.

According to the Amended Complaint, "[h]ad ADT alerted the authorities to the burglary in the early morning of March 26, Mr. Chattin would not have been able to murder Bryan Harris

---

[6]     The Amended Complaint does not explain why the Heeters called Harris at his apartment upon discovering that their residence had been "burglarized," particularly when the Amended Complaint does not state that the Heeters immediately recognized that one or more guns were missing from their collection.

more than, and at least, fifteen hours later, unsuspectingly."
Id. ¶ 89.

## II.   PROCEDURAL HISTORY

Plaintiff initiated this action on February 3, 2016,
alleging (1) fraud against Defendant ADT, (2) product liability
for defective design against both Defendants, (3) negligence
against both Defendants,[7] (4) a wrongful death claim on behalf of
Harris's estate against both Defendants, (5) a survival act
claim on behalf of Harris's estate against both Defendants,[8] and
(6) a Pennsylvania Unfair Trade Practices and Consumer
Protection Law ("UTPCPL"), 73 Pa. Cons. Stat. §§ 201-1 to
201-9.3, claim against Defendant ADT.

Plaintiff later moved for leave to file an Amended
Complaint, ECF No. 27, which the Court granted, ECF No. 28.
Defendant Honeywell moved to dismiss Plaintiff's Amended
Complaint, ECF No. 30, and Defendant ADT filed a motion for

---

[7]      Plaintiff has since withdrawn her negligence claim
against Defendant Honeywell. ECF No. 40.

[8]      In Pennsylvania, "[w]rongful death and survival
actions are not substantive causes of action; rather, they
provide a vehicle through which plaintiffs can recover for
unlawful conduct that results in death." Williams v. City of
Scranton, No. 10-388, 2013 WL 1339027, at *13 n.7 (M.D. Pa. Apr.
1, 2013) (quoting Sullivan v. Warminster Twp., 765 F. Supp. 2d
687, 707 (E.D. Pa. 2011)). Therefore, recovery by Harris's
estate is contingent on the success of the substantive tort
claims.

judgment on the pleadings, ECF No. 38. Following a hearing,
Defendants' motions are now ripe for disposition.

## III. LEGAL STANDARD

A party may move to dismiss a complaint for failure to
state a claim upon which relief can be granted. Fed. R. Civ. P.
12(b)(6). When considering such a motion, the Court must "accept
as true all allegations in the complaint and all reasonable
inferences that can be drawn therefrom, and view them in the
light most favorable to the non-moving party." DeBenedictis v.
Merrill Lynch & Co., 492 F.3d 209, 215 (3d Cir. 2007) (internal
quotation marks omitted). To withstand a motion to dismiss, the
complaint's "[f]actual allegations must be enough to raise a
right to relief above the speculative level." Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 555 (2007). This "requires more than
labels and conclusions, and a formulaic recitation of the
elements of a cause of action will not do." Id. Although a
plaintiff is entitled to all reasonable inferences from the
facts alleged, a plaintiff's legal conclusions are not entitled
to deference and the Court is "not bound to accept as true a
legal conclusion couched as a factual allegation." Papasan v.
Allain, 478 U.S. 265, 286 (1986).

The pleadings must contain sufficient factual
allegations so as to state a facially plausible claim for
relief. See, e.g., Gelman v. State Farm Mut. Auto. Ins. Co., 583

7

F.3d 187, 190 (3d Cir. 2009). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). In deciding a Rule 12(b)(6) motion, a court limits its inquiry to the facts alleged in the complaint and its attachments, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon these documents. See Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Judgment on the pleadings is appropriate only if the moving party "clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." Society Hill Civic Ass'n v. Harris, 632 F.2d 1045, 1054 (3d Cir. 1980) (citation omitted). In reviewing a Rule 12(c) motion, a court "must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008) (quoting Jablonski v.

Pan Am. World Airways, Inc., 863 F.2d 289, 290-91 (3d Cir. 1988)).

When a party's Rule 12(c) motion is "based on the theory that the plaintiff failed to state a claim," the motion is "reviewed under the same standards that apply to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." Caprio v. Healthcare Revenue Recovery Grp., LLC, 709 F.3d 142, 146-47 (3d Cir. 2013).

## IV.   DISCUSSION

Defendants raise several arguments as to why Plaintiff's claims should be dismissed. However, Plaintiff's claims against both Honeywell and ADT may be dismissed on one ground alone: neither Defendant's conduct and/or products proximately caused Harris's death.

Causation under Pennsylvania law requires the existence of two separate components: cause-in-fact and proximate cause. Reott v. Asia Trend, Inc., 55 A.3d 1088, 1103 (Pa. 2012). The components differ as follows:

> Cause in fact or "but for" causation requires proof that the harmful result would not have come about but for the conduct of the defendant. Proximate cause, in addition, requires proof that the defendant's conduct was a substantial contributing factor in bringing about the harm alleged. Where the relevant facts show either that the defendant was not responsible for the injury, or that the causal connection between the defendant's negligence and the plaintiff's injury is remote, the question of causation is decided by the court as a matter of law.

Robertson v. Allied Signal, Inc., 914 F.2d 360, 366-67 (3d Cir. 1990) (discussing Pennsylvania law).

Proximate cause, not cause-in-fact, is the issue in this case. For relief to be granted as to each of Plaintiff's claims, Defendants' allegedly tortious conduct and/or defective product must have been the proximate cause of the claimed harm. See Greunwald v. Advanced Computer Applications, Inc., 730 A.2d 1004, 1014 (Pa. Super. Ct. 1999) (in a fraud case, the plaintiff must establish that "the resulting injury was proximately caused by the reliance"); Weckel v. Carbondale Hous. Auth., 20 A.3d 1245, 1249 n.9 (Pa. Commw. Ct. 2011) (for a negligence claim, the plaintiff must establish that "the breach was the proximate cause of the plaintiff's injury"); see also Sikkelee v. Precision Airmotive Corp., 876 F. Supp. 2d 479, 489 (M.D. Pa. 2012) ("Strict liability also requires a showing that . . . the defect was the proximate cause of the plaintiff's injuries."); Baynes v. George E. Mason Funeral Home, Inc., No. 09-153, 2011 WL 2181469, at *6 (W.D. Pa. June 2, 2011) (stating that "the damages recoverable under the UTPCPL must be . . . proximately caused by the defendant's actions"); Phillips v. Nw. Reg'l Commc'ns, 669 F. Supp. 2d 555, 579 (W.D. Pa. 2009) (wrongful death liability under Pennsylvania's Wrongful Death Act, 42 Pa. Cons. Stat. § 8301, requires that defendant's negligence caused

the death, which includes establishing proximate cause);
Holbrook v. Woodham, No. 05-304, 2008 WL 4425606, at *7-8 (W.D.
Pa. Sept. 30, 2008) (survival action under Pennsylvania's
Survival Statute, 42 Pa. Cons. Stat. § 8302, requires
establishing the elements of negligence claim, which include
proximate cause).

        In the instant case, Plaintiff's harms are predicated
upon Harris's death. Plaintiff's alleged harm in her personal
capacity as Harris's mother is mental pain and suffering,
emotional distress, and the loss of her son's care and comfort.
Am. Compl. ¶¶ 94, 104, 128, 141. The alleged harm suffered by
Harris's estate, which is represented by Plaintiff as its
administratrix, is fear of impending death, loss of life's
pleasures, loss of earnings, and death. Id. ¶¶ 105, 127, 134,
142. Therefore, as to both sets of claims, the issue is the
same: whether Defendants' allegedly tortious conduct and/or
defective products proximately caused Harris's death.

        Pennsylvania courts utilize the "substantial factor"
test from the Restatement (Second) of Torts ("the Restatement")
to ascertain proximate cause. Whitner v. Von Hintz, 263 A.2d
889, 893-94 (Pa. 1970). At times, courts have been unclear as to
whether this "substantial factor" determination is one of fact
for the jury or one of law for the court. Recently, albeit in a
nonprecedential opinion, Judge Fisher clarified the issue:

11

The parties dispute the extent to which proximate cause may be determined by the court. [The plaintiff] maintains that proximate cause is an inherently fact-based question that should generally be resolved by a jury. See Ford v. Jeffries, [379 A.2d 111, 114 (Pa. 1977)] (explaining that the issue of proximate cause "should not be taken from the jury if the jury may reasonably differ as to whether the conduct of the defendant was a substantial cause or an insignificant cause" (emphasis added)). [The defendants] counter that proximate cause is a question of law properly decided by the court. See Vattimo v. Lower Bucks Hosp., Inc., [465 A.2d 1231, 1233 (Pa. 1983)] (recognizing that proximate cause is an issue of legal policy); Eckroth v. Pa. Elec., Inc., 12 A.3d 422, 427-28 (Pa. Super. Ct. 2010) (stating that proximate cause is an issue of law for the court to determine). As Ford makes clear, however, nothing precludes a court from determining proximate cause as a matter of law if a jury could not reasonably differ on the issue. 379 A.2d at 114.

Chetty Holdings Inc. v. NorthMarq Capital, LLC, 556 F. App'x 118, 121 (3d Cir. 2014) (nonprecedential) (emphasis in original). To put it another way, where there is no issue of fact, the issue of proximate cause is one for the court to determine as a matter of law.[9]

---

[9] There may be no question of fact where the parties stipulate to the facts, no reasonable jury could differ, or the facts in the complaint are taken as true and in the light most favorable to the plaintiff. These events occur at various stages in a case's lifespan. But at each of these stages, the Court applies the same substantive law to determine whether the facts that a plaintiff has alleged (in the case of a Rule 12(b)(6) pre-answer motion or Rule 12(c) post-answer motion) or shown (in the case of a Rule 50(b) post-verdict motion or Rule 56 pretrial motion) make out a legally cognizable claim. See Caprio, 709 F.3d at 146-47 (explaining that a Rule 12(c) motion "based on the theory that the plaintiff failed to state a claim . . . is reviewed under the same standards that apply to a motion to dismiss under Federal Rule of Civil Procedure

The following considerations are deemed important under the Restatement's "substantial factor" test to determine proximate cause: (1) the number of factors other than the actor's conduct that contributed to producing the harm and the extent of their contribution; (2) whether the actor's conduct created a force or series of forces that were in continuous and active operation up to the time of the harm, or created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (3) the lapse of time between the actor's conduct and the harm. Vattimo, 465 A.2d at 1234;

---

12(b)(6)"); Huggins v. Zaloga, No. 11-2061, 2013 WL 1330812, at *3 (M.D. Pa. Mar. 29, 2013) (citing Mele v. Fed. Reserve Bank of N.Y., 359 F.3d 251, 257 (3d Cir. 2004)) (explaining that Rule 12(c)'s focus on the pleadings is "[t]he one significant difference" between the resolution of Rule 12(c) and Rule 56 motions); LBL Skysystems (USA), Inc. v. APG-Am., Inc., 319 F. Supp. 2d 515, 525 (E.D. Pa. 2004)("The standards for a judgment as a matter of law under Rule 50(b) mirrors the standard for summary judgment under . . . Rule 56(e).").

   Accordingly, because the Court takes Plaintiff's factual allegations as true, in order to determine whether Plaintiff has alleged a plausible claim under Rules 12(b)(6) and 12(c) in this case, other cases decided under Rules 50 and 56 are helpful to discern the legal standard under Pennsylvania law and how courts have applied it. See, e.g., Twombly, 550 U.S. at 553 (looking to Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540 (1954), an opinion rendered at the summary judgment stage, to determine the substantive legal standard to apply at the pleading stage); Boice ex rel. Rought v. Tyler Mem'l Hosp., No. 06-1709, 2007 WL 2903424, at *6 (M.D. Pa. Sept. 28, 2007) (citing Brown v. Phila. Coll. of Osteopathic Med., 760 A.2d 863, 868 (Pa. Super. Ct. 2000), an opinion rendered at the Rule 50 stage, to determine the applicable causation standard for a claim at the pleading stage).

Restatement (Second) of Torts § 433 (1965). The Court will address these considerations seriatim.

First, the Court considers the factors--other than the failure of the alarm system, to which the Plaintiff attributes Harris's murder--that contributed to producing the harm and the extent of their contribution. See Vattimo, 465 A.2d at 1234.

The Superior Court of Pennsylvania relied heavily on this consideration in Brown v. Phila. Coll. of Osteopathic Med., 760 A.2d 863 (Pa. Super. Ct. 2000), to determine that the defendant's alleged negligence was not the proximate cause of the plaintiffs' harm. Id. at 872. In Brown, a couple alleged that the defendant-hospital, which erroneously diagnosed their newborn baby with syphilis, proximately caused the breakdown of their marriage, the husband's physical violence toward the wife, and the wife's loss of employment after she shot the husband. Id. at 866-67. A jury found in the plaintiffs' favor, and the defendant appealed, arguing that the trial court erred by failing to grant judgment in the defendant's favor because the plaintiffs failed to establish proximate cause.[10] Id. at 867.

The Pennsylvania court concluded that "it is abundantly clear that factors other than the negligence of [the defendant] had a far greater effect in producing the harm complained of by the [couple]." Id. at 869. Other contributing

---

[10]     See supra n.9.

14

factors included the husband's extramarital affair and
confession of the affair to the wife, as well as the husband's
suspicions that the wife was having an affair herself. <u>Id.</u>
Because those factors "had the greatest effect in bringing about
the marital discord and eventual breakdown for which the couple
[sought] compensation," the court held that the defendant's
alleged negligence was so remote that, as a matter of law, the
defendant could not be held liable for the plaintiffs' harm. <u>Id.</u>
at 869.

   Here, as in <u>Brown</u>, it is "abundantly clear" that
factors other than Defendants' alleged negligence and/or
defective products had a substantially greater impact on the
events leading to Harris's death. <u>See id.</u> at 869. These
contributing factors included Chattin's "conscious disregard for
the well-being of . . . Bryan Harris," Am. Compl. ¶ 32;
Chattin's decision to "ma[ke] his way to the location of
Heeter's heirloom firearms and begin taking them out of the
house," <u>id.</u> ¶ 55; Chattin's decision to "ma[ke] his way to Bryan
Harris's apartment, approximately twenty minutes away," <u>id.</u>
¶ 57; and the fact that the murder was "pre-meditated," <u>id.</u>
¶ 61. These factors "had a far greater effect" than the
allegedly defective alarm system in bringing about Harris's
death. <u>See Brown</u>, 760 A.2d at 869.

Second, the Court considers whether Defendants'
actions and/or products created a force or series of forces that
were in continuous and active operation up to the time of the
harm, or created a situation harmless unless acted upon by other
forces for which the actor is not responsible. See Vattimo, 465
A.2d at 1234.

Mack v. AAA Mid-Atlantic, Inc., 511 F. Supp. 2d 539
(E.D. Pa. 2007), is a helpful example of this second
consideration. In Mack, the plaintiff fell on an icy sidewalk
after a tow truck driver, employed by the defendant-corporation,
refused to provide the plaintiff with transportation. Id. at
542-43. Applying Pennsylvania law, the district court granted
summary judgment[11] to the defendant because the driver's failure
to transport the plaintiff was not a substantial factor in
bringing about the plaintiff's harm. Id. at 546-47. The court
explained that "Plaintiff's fall occurred in a location other
than where the towing services were denied, on a sidewalk down
the block from the parking lot" where the driver had towed her
vehicle. Id. at 547. In other words, the denial of services, at
most, initiated a sequence of events that required the plaintiff
to walk and eventually slip on ice. See id. Instead of creating
a force in continuous and active operation up to the time of the
plaintiff's fall, the driver merely "created a situation

---

[11]        See supra n.9.

16

harmless unless acted upon by other forces" for which the driver
was not responsible. Id.

      The causal connection in this case is even more
attenuated than the causal connection in Mack. The alarm
system's failure to notify Plaintiff that the security perimeter
of her residence had been breached did not initiate a sequence
of events like the denial of services in Mack did. The sequence
of events here was initiated long before, as evidenced by
Plaintiff's preexisting cause for concern about Chattin, Am.
Compl. ¶¶ 15, 23, 31, and Chattin's preexisting "conscious
disregard for the well-being . . . of Bryan Harris," id. ¶ 32.
The alarm system's failure to notify Plaintiff did not cause
Chattin to steal the .30 caliber rifle, drive across town, wait
for Harris to return from work, and eventually murder Harris. As
such, the alarm system's failure did not, in and of itself,
create a harm that was in continuous and active operation up to
the time of Harris's murder. The alarm system's failure merely
created a situation harmless in itself unless and until acted
upon by another force, namely Chattin, for which Defendants were
not responsible.

      Similarly, in Eckroth v. Pennsylvania Electric, Inc.,
12 A.3d 422 (Pa. Super. Ct. 2010), the Superior Court of
Pennsylvania affirmed the lower court's grant of summary
judgment because the defendant's alleged negligence was not the

17

proximate cause of the claimed harm. Id. at 424. The Eckroth defendant, an electric utility, disconnected the electricity to a home due to nonpayment. Id. at 425. Without electricity, the residents lit a candle, which was knocked over, starting a fire that killed several of the residents' guests. Id. at 429. The court considered the defendant's decision to terminate the power, the residents' decision to forego battery-powered lighting in favor of candlelight, and the residents' decision to leave an exposed and burning candle unattended during the night. Id. The court explained that "the residents' election to forego inherently safe lighting in favor of using an unattended open flame . . . during sleeping hours stands as an extraordinary breach of fire safety culminating in a fire not reasonably foreseeable as a normal and probable consequence of their loss of electric lighting nearly two days earlier." Id. Thus, the court concluded that "[i]t seems highly extraordinary that [defendant's] action could have caused [the residents] to make the decisions from which [the decedents'] harm directly flowed, such that we are compelled to conclude as a matter of law that [the defendant's] alleged negligence was not the proximate cause of the tragic consequences that followed it." Id.

Here, as in Eckroth, it would seem "highly extraordinary" that Defendants' allegedly tortious conduct and/or defective products caused Chattin to make the crucial

18

decision to murder Harris--a decision from which Plaintiff's
harm directly flowed.

Third, the Court considers the lapse of time between
the alleged tortious conduct and the harm. See Vattimo, 465 A.2d
at 1234. Lapse of time alone is not sufficient to prevent an
actor's negligence from being the proximate cause of a harm.
Taylor v. Jackson, 643 A.2d 771, 776 (Pa. Commw. Ct. 1994).
Rather, it is to be weighed alongside the other considerations
set forth in the Restatement.

For example, in Phillips v. Northwest Regional
Communications, 669 F. Supp. 2d 555, the administratrix of a
decedent's estate brought a wrongful death action against the
county, the county's 911 call center, the center's supervisor,
and center employees. Id. at 566-67. The killer was the
decedent's boyfriend, who was employed at a county 911 call
center. Id. at 561. One day, while at work, the killer ran an
unauthorized search for vehicle and address information related
to the decedent. Id. That same day, away from the call center,
the killer called his coworkers for directions to a specific
address and the coworkers complied. Id. at 565. The killer's
requests were reported, and he was fired later that day. Id. at
566. He then purchased a pistol, ammunition, and handcuffs. Id.
Approximately twelve hours after the killer had called his
coworkers and after "driving around" for a while, the killer

went to the address for which he previously requested directions and shot the decedent, resulting in her death. Id. at 566, 572.

The Phillips court found that the administratrix could not establish proximate cause between the act of any individual defendant and the decedent's ultimate death. Id. at 579. The court explained that the shooting occurred more than twelve hours after the coworkers provided directions to addresses with which the killer was already familiar and "after several intervening events, e.g., [the decedent's] telephone calls to [the killer] on the morning of [the day of the murder], his firing, and his purchase of a handgun." Id.

Here, like the killer in Phillips who spoke with coworkers and then drove around for a period of time before committing the murder, Chattin broke into Plaintiff's residence and then drove twenty minutes away to a different location to commit the murder. But the temporal lapse between the alarm's failure to notify Plaintiff of the intrusion into her residence and Harris's murder at Harris's apartment (fifteen hours) is even greater than the lapse in Phillips (twelve hours). Therefore, given the length of time between the alarm system's failure and Harris's murder, as well as the several intervening events that transpired during that time span, the alarm system's failure, like the coworkers' actions in Phillips, was not a substantial factor in producing Harris's death.

In sum, taking the well-pleaded facts in Plaintiff's Amended Complaint as true and all reasonable inferences that can be drawn therefrom, even when construed in the light most favorable to Plaintiff, Plaintiff cannot show that Defendants' proximately caused the claimed harm. Therefore, Plaintiff fails to state a facially plausible claim for fraud, negligence, defective design, or UTPCPL violation against Defendants.

## V.   LEAVE TO AMEND

The issue remains whether Plaintiff should be permitted to amend her complaint. Leave to amend shall be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). The Court may decline to grant leave where the "plaintiff's delay in seeking amendment is undue, made in bad faith, prejudicial to the opposing party, or [the amendment] fails to cure the jurisdictional defect." Berkshire Fashions, Inc. v. M.V. Hakusan II, 954 F.2d 874, 886 (3d Cir. 1992). Leave to amend may also be denied if amendment would be futile. Alvin v. Suzuki, 227 F.3d 107, 121 (3d Cir. 2000). "An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." Id.

Here, further amendment would be futile because Plaintiff's claims could not survive a subsequent motion to dismiss or a renewed motion for judgment on the pleadings for

21

lack of proximate cause. The Court will not grant Plaintiff leave to amend.

## VI.   CONCLUSION

      For these reasons, the Court will grant Defendant Honeywell's Motion to Dismiss, grant Defendant ADT's Motion for Judgment on the Pleadings, and dismiss Plaintiff's Amended Complaint with prejudice. An appropriate order follows.

ENTERED

JUL – 1 2016

CLERK OF COURT

22